IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DIVISION OF ARKANSAS
LITTLE ROCK DIVISION

IN RE:    GS INC., Debtor                                        4:03-bk-22864E
                                                                  CHAPTER 7

M. RANDY RICE                                                    PLAINTIFF

V.                              AP NO: 4:05-ap-1280

HYDRO TEMP CORPORATION                                           DEFENDANT

### MEMORANDUM OPINION

Now before the Court is the Chapter 7 Trustee's *Complaint to Avoid Preferential Payment and for Judgment Against the Defendant*, filed on October 20, 2005.[1] The Court heard oral arguments and testimony on this matter on August 22, 2006. Mr. M. Randy Rice, Chapter 7 Trustee ("**Trustee**"), appeared on his own behalf, and Mr. Martin E. Lilly appeared on behalf of Hydro Temp Corporation (hereinafter referred to as "**Hydro**"). At the conclusion of the trial, the Court took the

---

[1] The Court notes that in this case, the pre-2005 Code applies. Although most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("**BAPCPA**") went into effect on October 17, 2005, "the amendments made by this Act shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act." BAPCPA § 1501. A case is commenced by the filing with the bankruptcy court of a petition under such chapter. 11 U.S.C. § 301(a). The bankruptcy petition in this case was filed on October 27, 2003, which was prior to BAPCPA's effective date. Therefore, this case is unaffected by the changes in BAPCPA.

1

matter under advisement.

Upon consideration of the testimony and evidence presented at trial and the applicable law, the Court makes the following findings of fact and conclusions of law in accordance with Rule 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), and the Court has jurisdiction to enter a final judgment in this matter.

## ISSUES

There were two issues raised at trial, one of which was the issue of GS Inc.'s (the Debtor's) insolvency. However, because there is a presumption of GS Inc.'s insolvency[2], which was unrebutted by Hydro, the Court ruled in favor of the Trustee on that issue. The second and more detailed issue was whether, pursuant to 11 U.S.C. § 547(c)(2), the transfer was in the ordinary course of business, and therefore, removed from the Trustee's avoidance powers. Based on the evidence presented at trial, the Court finds that Hydro met its burden of proof on all three elements of the ordinary course of business exception, and therefore, the Court finds that the transfer is not within the Trustee's avoidance powers under the Bankruptcy Code.

## FACTS

The facts of this case revolve around a construction project at the Arkansas

---

[2] 11 U.S.C. § 547(f) states that, "For purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."

2

Sheriff's Boys and Girls Ranch, a small part of which involved the installation of heating and cooling units. At the outset of this project, M.A. Jones, the general contractor, selected GS Inc., as the subcontractor, as it presented the lowest bid. GS Inc. selected Hydro as the supplier of the heating and cooling units based on the proposal Hydro submitted.[3]

    Mr. William Michael Jones, president of Hydro, was the only witness who testified at trial. He provided both an explanation of the sequence of events that led up to the transfer, as well as testimony that those events, and the actual transfer, were in the normal course of business for Hydro. His testimony regarding the sequence of events was as follows. Once Hydro heard of the construction project and the need for heating and cooling units, it submitted a proposal to GS Inc. The proposal outlined the exact items that were to be manufactured and delivered by Hydro, and as to payment terms, stated that "Payment to be made as follows: NET 30." Based on the proposal submitted to GS Inc., Hydro was selected by GS Inc. as the supplier. Then, GS Inc. submitted a purchase order dated May 9, 2003, to Hydro. Hydro then manufactured the heating and cooling units and prepared them for shipment to the

---

[3] These heating and cooling units were referred to as "earth cooled heat pumps." These units are unique in that they use ground temperature water as the source for heating and cooling, which is particularly important at times when there are spikes in natural gas rates.

construction site. The Bill of Lading showed that the units were to be delivered on or around June 4, 2003.[4] Once the units were shipped, an invoice was prepared. The invoice was dated June 11, 2003, approximately one week after delivery of the units to the construction site, and the invoice listed the "Payment Terms" as "Net Due." On August 15, 2003, which was seventy days (or approximately the 10th week) after delivery of the units, Hydro received payment from GS Inc. for the heating and cooling units.

Mr. Jones also testified that the entire process in this situation—the proposal, manufacturing, shipping, invoicing, and payment for the units—was according to the normal practices of Hydro. Moreover, all events, from the proposal to the payment, took place without any communication between Hydro and GS Inc.[5] Mr. Jones did not visit the construction site, nor did he ever have a meeting with a representative from GS Inc. Because the process was according to the normal practices of Hydro, there was no writing between Hydro and GS Inc. regarding the receipt of payment on GS Inc.'s account with Hydro. Mr. Jones' testimony about the normalcy of the entire

---

[4] The Bill of Lading was dated June 3, 2003, and included a certification by the shipper, dated June 4, 2003, that materials were in proper condition for transportation; therefore, they were delivered on or around June 4, 2003.

[5] This statement is true with only one exception—when a GS Inc. employee called Hydro to get directions to the construction site.

process was based on the fact that Hydro has been in the manufacturing business for thirty years, and has a separate division, which installs the heating and cooling units, that has been in business thirty-four years. Because of Mr. Jones' experience with both manufacturing and installation, he has a good working knowledge of the normal practices of the contracting business.

At trial, the Trustee argued that this transfer was out of the ordinary course of business. He argued that, with respect to this transfer, the parties varied from the terms of payment as listed on the proposal and the invoice, and that Hydro did not actually receive payment within the normal time frame.

In responding to the Trustee's argument, Mr. Jones testified that regardless of the payment terms listed on the invoice, he expected to be paid only after the units were installed and after GS Inc. received payment from the general contractor. He specifically stated that he has never received payment in less than thirty days and that the term of payment was merely a "request" to be paid within thirty days. Mr. Jones also testified that Hydro did actually receive payment within the normal time frame; that the normal time to receive payment is two months from delivery. Mr. Jones explained that the reason for the normal two-month time frame is that payment is dependent on the timing of the sequence of events in a routine construction project. He described the sequence of events is as follows: The subcontractor goes to the

5

general contractor at the completion of certain phases of the project and requests payment. The general contractor then pays the subcontractor who then pays the supplier. The supplier generally gets paid approximately two months after delivery. In Mr. Jones' experience, the process which dictated the time frame for payment in this scenario is the normal process industry-wide, and because payment was received within that normal time frame, no lien was filed.

In an attempt to point out a conflict in Mr. Jones' oral testimony, the Trustee questioned Mr. Jones about two prior written statements. The first conflicting statement was from the Statement of Facts section of Hydro's *Memorandum in Support of Motion for Summary Judgment*.[6] The statement was as follows:

> Consistent with this course of dealing, Hydro-Temp received payment from G.S., Inc., for the goods shipped in June approximately six to eight weeks after the invoice was sent. [sic] The six to eight week time frame for payment is a normal turn around time for payment because the subcontractor, G.S., Inc., receives the goods and after they are installed the subcontractor places a draw with the general contractor.

---

[6]The Statement of Facts section of Hydro's *Memorandum in Support of Motion for Summary Judgment* was introduced by the Trustee as Plaintiff's Exhibit 16. Mr. Lilly objected, arguing that the memorandum was not evidence. He did confirm that the Statement of Facts was drafted by him, based on information given to him by his client. The Statement of Facts was not verified by his client before it was filed. Mr. Jones verified, while on the witness stand, that the Statement of Facts was true (with the exception of one sentence unrelated to the sentence at issue), and the Court accepted the Statement of Facts into evidence, subject to both the proper weight and cross examination.

The second conflicting statement was from an Affidavit of William Michael Jones, which was attached to Hydro's *Motion for Summary Judgment*. Within the Affidavit, there were the following statements:

> 6. As is consistent with Hydro-Temp's business relationship with other contractors and subcontractors like G.S., Inc., Hydro-Temp waited between six and ten weeks for G.S., Inc.'s payment for the shipped goods. Within that time frame Hydro-Temp was paid in full by G.S., Inc. for the first shipment.
>
> 7. It is consistent and typical in the construction supplier business for a supplier to wait six to ten weeks for payment because once the invoice is received by the subcontractor, like G.S., Inc., the subcontractor then places a request or 'draw' with the general contractor for payment. The subcontractor must wait for payment from the general contractor before the payment is transmitted to the supplier.

Mr. Jones' response to the Trustee's inquiry about these two statements was that the six to eight week period referred to in the Statement of Facts and the six to ten week period referred to in the Affidavit were, in his mind, not inconsistent with his testimony that Hydro normally received payment within two months from the date of delivery of the units.

Mr. Jones also testified about Hydro's second delivery to GS Inc. of four additional heating and cooling units and the invoice for this shipment. The Bill of Lading for the second shipment was dated July 28, 2003, and the invoice for the second shipment was dated July 31, 2003—both of which were dated after Hydro's first shipment had been delivered and invoiced. At the time the second shipment was

delivered to the construction site, Hydro had not received payment from GS Inc. on the invoice for the first shipment, and Hydro was unaware that GS Inc. was suffering any financial difficulty. Mr. Jones testified that there was no note on the invoice for the second shipment about not receiving payment on the first shipment; there was no communication with GS Inc. regarding the lack of payment on the first shipment's invoice; and Hydro had made no effort to contact an attorney to assist in getting GS Inc. to make payment on the first shipment's invoice. At the time of Hydro's second shipment, Mr. Jones had not been notified by his staff that the time to file a lien was approaching, and therefore, he was not concerned about GS Inc.'s account.[7] The second shipment proceeded according to normal practices until payment for the second invoice was not received in the normal sequence. As a result of the disruption in the normal process, Hydro filed a lien for the amount owed as stated in the second invoice.

## ANALYSIS

11 U.S.C. § 547(b) of the Bankruptcy Code provides that transfers made by the

---

[7] In the event that the date is approaching in which a lien needs to be filed, Mr. Jones explained that a member of his staff is responsible for informing him that the deadline to file a lien is approaching. The account is flagged and typically Mr. Jones will call the general contractor to see why the subcontractor has not been paid. He will then call the subcontractor to discuss when payment will be received. He testified that payment is usually promptly received once he mentions to the subcontractor that he will file a lien.

debtor during the ninety-day period preceding the filing of a petition for bankruptcy may be avoided in bankruptcy as a "preference." *Gateway Pacific Corp. v. Expeditors International of Washington, Inc. (In re Gateway Pacific Corp.)*, 153 F.3d 915 (8th Cir. 1998). The purpose of the section 547 avoidance provision of the Bankruptcy Code is to place all unsecured creditors on an equal basis for purposes of distribution of the debtor's assets. *William S. Meeks, Trustee v. Harrah's Tunica Corp. (In re Armstrong)*, 231 B.R. 723, 731 (Bankr. E.D.Ark. 1999) (citing *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 566 n. 10 (8th Cir. 1988)).

However, according to the ordinary course of business exception, the transfer is insulated from avoidance if the transfer is (a) "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;" (b) "made in the ordinary course of business or financial affairs of the debtor and the transferee; and" (c) "made according to ordinary business terms." *See* 11 U.S.C. § 547(c)(2)(A)-(C). There is no precise legal test which can be applied to determine whether a payment was made in the ordinary course of business, "rather the court must engage in a 'peculiarly factual analysis.'" *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991). "A factual analysis should be conducted to determine whether the transaction would be one that would have occurred in the ordinary course of the financial affairs of a borrower or debtor in the same position."

*In re Armstrong*, 231 B.R. at 731. Courts have traditionally examined a variety of factors to determine whether the transfers were ordinary as between a debtor and a creditor including: (1) the length of the time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition. *Gary Stewart and Joyce Bradley Babin, Trustee v. Barry County Livestock Auction, Inc. (In re Stewart)*, 274 B.R. 503, 513 (Bankr. W.D. Ark. 2002). The lack of any history between the parties is not necessarily determinative; a transferee must establish under § 547(c)(2) that the debtor made the payments in the ordinary course of business for *both* parties. *Scott P. Peltz, Plan Administrator v. The Denver Post Corp. (In re Bridge Information Systems, Inc.)*, 297 B.R. 759, 763 (Bankr. E. D. Mo. 2003)(emphasis added).

For a payment to qualify under the exception of subsection (c)(2) of section 547, and to render the transfer nonavoidable, a creditor must prove by a preponderance of the evidence the three statutory conjunctive elements. *In the Matter of J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3rd Cir. 1989). The Court notes at the outset of its analysis that the facts of this case are simple, but nonetheless, these facts trigger the application of the ordinary course of business

exception, which has three separate elements. The analysis may seem repetitive because many of the same facts apply to at least two—if not all three—of the elements.

The Court's first inquiry is whether GS Inc.'s debt to Hydro was "incurred" in the ordinary course of their business dealings. *See* 11 U.S.C. § 547(c)(2)(A). Section 547(c)(2)(A) focuses on the nature of the original transaction creating the debt and whether it was ordinary. *In re Armstrong*, 231 B.R. at 731. Evidence relevant to this issue began with the fact that this was a construction project, in which Hydro submitted a proposal to all the bidding subcontractors involved, including GS Inc. Hydro submitted the same proposal (containing the same price) to each bidding subcontractor. After GS Inc. accepted Hydro's proposal (as it was the lowest), and submitted its purchase order to Hydro, Hydro manufactured the equipment and delivered it to the construction site. Within approximately one week after delivery, Hydro prepared and sent an invoice to GS Inc. In sum, Mr. Jones testified that based on his thirty years in the manufacturing business, everything from the proposal to the invoice occurred in the ordinary course of business. Based on this testimony, the Court finds that the nature of the transaction creating the debt was ordinary as to the financial affairs of both the debtor and the transferee.

The second element of the ordinary course of business exception is that the

11

transfer or payment must be made in the ordinary course of business or financial affairs of both the debtor and the transferee. 11 U.S.C. § 547(c)(2)(B). This subjective element focuses on whether the payment was made in the ordinary course of the business affairs of this debtor and creditor. *In re Armstrong*, 231 B.R. at 730 (citing *In re Spirit Holding Co., Inc.*, 153 F.3d 902, 904 (8th Cir. 1998)). In order to comport with both the language of the statute and its purpose, the primary focus is upon whether the transaction is consistent with prior dealings between the parties. *Id*. However, when there is no history between the parties, the method used by courts to determine whether a transfer was in the ordinary course of business is less uniform. *See Carlota M. Bohm, Trustee v. Golden Knitting Mills, Inc.*, *(In re Forman Enterprises, Inc.)*, 293 B.R. 848, 857-58 (Bankr. W.D. Pa. 2003). One particular approach used when there is no history between the parties is to examine the conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt. *Id*. at 858. If nothing unusual or untoward occurred, there is no good reason to conclude that the transfer was out of the ordinary. *Id.*

It is undisputed that this was the first transaction between Hydro and GS Inc. This Court will take the same approach as the court in *Forman Enterprises, Inc.*, which seems to be the most appropriate under these circumstances, and will look to

the conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt.

Mr. Jones explained that once the installation process was complete, GS Inc. made a request for payment from M.A. Jones, and M.A. Jones requested payment from the owner of the property. Once M.A. Jones and GS Inc. were paid, then GS Inc. paid Hydro.[8] Hydro received payment via check, two months (approximately seventy days) after the date of delivery. Mr. Jones explained that he has a designated staff member who advises him of any account that remains outstanding when the deadline to file a lien is approaching. He testified that he was not notified of any such deadline approaching in this scenario because payment was received within seventy days of the date of delivery, which was the normal time frame.[9] Mr. Jones further explained that there wasn't any real inconsistency between the written statements referenced by the Trustee, and his oral testimony; the six to eight week period and the six to ten week period were consistent with his testimony that the normal time frame to receive

---

[8]The Trustee asked Mr. Jones if he had any documents to prove that a request for payment had been made by M.A. Jones and GS Inc., and Mr. Jones responded that he did not. His testimony was based on his knowledge of the normal progression in a construction project.

[9]Because payment was made and a lien was not filed, Hydro is an unsecured creditor as to the first invoice, but is a secured creditor on the debt incurred in the second shipment.

payment was two months from the date of delivery. In sum, Mr. Jones testified that all the events surrounding GS Inc.'s payment on the first invoice was ordinary.

As the Trustee pointed out, the invoice and the proposal did, in fact, state specific payment terms ("NET DUE" and "NET 30"); however, Mr. Jones testified that he never received payment according to those terms due to the very nature of the construction process, and that the payment terms stated on the proposal and invoice were nothing but a "request" to be paid within thirty days. Mr. Jones testified that in his experience, payment is never received within that thirty-day time frame. The Court was impressed with Mr. Jones' testimony, finding him to be a credible witness.

The Court finds Hydro's failure to make any effort to collect from GS Inc. to be particularly persuasive in determining "ordinary course." The evidence was that Hydro did not contact GS Inc. requesting payment. Nor was there evidence that Hydro had contacted an attorney about collecting payment, or that Hydro made any notation on an invoice for a second shipment of units to GS Inc. referring to GS Inc.'s failure to pay on the first invoice.[10] The Court would expect that if the normal period of time to pay had expired, there would be a notation on the invoice, or at least there would be evidence that Hydro made some collection effort. But there is no such

---

[10] The second set of units was to be delivered on or around July 28, 2003, which was before payment was even received on the first invoice.

evidence. Instead, Hydro showed a lack of concern about receiving payment, and delivered a second shipment to GS Inc. pursuant to the proposal, while payment on the first invoice and shipment was outstanding. Therefore, the Court finds that neither of the parties did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt and that the payment was in the ordinary course of business or financial affairs of both the debtor and the transferee.

The final element to be addressed is whether the transfer was made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C). This is an objective element focusing on industry practice, and requiring a finding that the GS Inc.'s payment to Hydro was ordinary in relation to the standards prevailing in the relevant industry. *In re Armstrong,* 231 B.R. at 732. "Ordinary business terms" means that the transaction was not so unusual as to render it an aberration in the relevant industry. *Frederick M. Luper, Trustee v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811 (6th Cir. 1996). Hydro has been in business thirty-plus years. Mr. Jones testified that Hydro has a separate division that installs the heating and cooling units that Hydro also manufactures. Therefore, Mr. Jones is familiar with not only the manufacturing aspect, but also the installation aspect of this business. Because of the nature of the construction business, specifically the fact that the supplier is the last to be paid, it takes around two months for suppliers, such as Hydro, to receive payment. Hydro

was, in fact, paid for the units within the normal time frame of two months, and thus, there was nothing unusual about this transaction. It is clear from the testimony that payment in the construction business is based on job progress, not on the counting of days. Based on Mr. Jones' testimony regarding the normal practices in the construction business, the Court finds that there was nothing unusual in this transaction which would render it outside the ordinary course of business for this industry.

Based on the analysis above, the Court finds that Hydro has met its burden of proof as to each of the three elements of the ordinary course of business exception. Based on this finding, the Trustee is not entitled to avoid this transfer as preferential under 11 U.S.C. § 547(b) for the benefit of the unsecured creditors. Therefore, judgment will be entered in favor of Hydro.

A separate judgment in accordance with this Opinion will be entered.

**IT IS SO ORDERED**.

_____
HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE

DATE: October 12, 2006

cc: M. Randy Rice, Plaintiff-Chapter 7 Trustee

Martin E. Lilly, attorney for Defendant Hydro Temp Corp.
U.S. Trustee